[No. 1400.]

## John Strickland v. The State.

1. PRACTICE—CONTINUANCE.—Even though sufficient in other respects, an application for a continuance is properly refused if it fails to allege'that there is no reasonable expectation of securing the attendance of the absent witness during the term of the court by a postponement of the trial to a future day thereof.

2. SAME—EVIDENCE—NEWLY DISCOVERED EVIDENCE—NEW TRIAL.—See the opinion *in extenso* for evidence set forth in applications for continuance, postponement, and for new trial, based upon newly discovered evi-

dence, all of which, being material and admissible, and the probability of its truth not being controverted nor called in question by the evidence adduced, entitled the defendant to a new trial, when considered in connection with the testimony on the trial.

APPEAL from the District Court of Orange. Tried below before the Hon. W. H. Ford.

The conviction was for the murder of James Norris, the verdict being for murder in the first degree with a life term in the penitentiary assessed as punishment.

The opinion of the court states the case in full.

The motion for new trial brings in review the questions discussed in the rulings of this court, and assails the rulings of the trial court on questions of evidence, to which exceptions do not appear to have been reserved.

*J. T. Stark,* for the appellant.

*O. S. Eaton,* for the State.

WILLSON, J. · This appeal is from a judgment of conviction of murder in the first degree, the punishment assessed being confinement in the penitentiary for life. That the conclusions to which we have arrived in regard to the questions involved in the case may be properly understood, it will be necessary for us to give at least a summary of the evidence as shown by the record.

On the night of the twelfth of August, 1882, the defendant stabbed and wounded John Norris, inflicting upon Norris two wounds, from the effects of which he died about five days thereafter. This occurred in the town and county of Orange, and in the house of the defendant. Defendant's house was small, consisting of but one room sixteen by eighteen feet. It was his dwelling house, in which he resided with his wife and children, and in which he also lodged three boarders, one of whom was the deceased. One Heard, a witness who testified in the case, and one Henry were the other boarders. Heard testified that on the night of the homicide the beds in the house were arranged as follows: In one corner was a bed usually occupied, and occupied on that night, by the defendant and himself. In the corner opposite the side of this bed was another, occupied by deceased and the other boarder, Henry; and in the corner opposite the foot of defendant's bed was a bed on the floor, which

was occupied by defendant's wife and children. This witness Heard states, substantially, that on the night of the killing, at about ten o'clock, he went to bed, and that defendant was then in bed and, witness thought, was asleep. Deceased was then out in town. About twelve or one o'clock, witness was awakened by the falling of the bedstead on which he was asleep, when he heard Norris calling him to get up; that Strickland was cutting him, Norris, all to pieces. He jumped up and approached Norris and Strickland, who were then struggling about the middle of the room, and asked them what they were rowing about. Strickland replied, "He pulled me out of bed by the hair of my head, and was stamping me," when Norris at once replied, "You are a liar; you have killed me for nothing." Mrs. Strickland, by this time, had struck a light, and Norris said to witness, "Open the door." When the light was struck, witness saw that Norris was holding Strickland by each wrist, and, being the stronger and larger man of the two, ran Strickland backwards and shoved him out at the door. Norris then turned to witness, and said: "Go for a doctor; I am bleeding inside, and will not live fifteen minutes. Strickland has killed me for nothing; and it is d——d hard that I have to die for nothing. I had pulled off my clothes, and was sitting on the side of my bed, cooling, when Strickland commenced cutting me." Norris then went to the back wall of the house, and took from a pouch that was hanging there a pistol, and fired it from the door in the direction Strickland had ran off. Witness did not see, on that night, the knife with which the stabbing was done, but stated that on the next morning Strickland showed him a large pocket knife, and told him it was with that knife he had cut Norris. Witness did not know what caused his bedstead to break, but it appeared to have been broken by something falling against it. He thought that if Norris had pulled Strickland out of the bed it would have awakened witness, and he would have known it. Witness remained with deceased nearly all the time after he was wounded, until he died, and states that a short time before he died he told witness he was going to die; that he had no hope of getting well, and that Strickland had killed him for nothing; that the night he was cut he had come in and pulled off his clothes to go to bed, and was sitting on the side of the bed cooling, as he was warm—had been drinking; that while he was siting there Strickland commenced cutting him before he knew anything about it, as it was dark in the room at the time; and that it was hard he had to die for

nothing.   Witness said Norris was perfectly sane when he made this statement, and made the same voluntarily, without being persuaded to do so, or without being interrogated.

Mrs. Strickland, wife of defendant, testified that she was awakened by a voice that she thought to be her husband's, calling Dick, his bedfellow, who was called Dick Heard.   She arose and struck a light and saw Norris and her husband standing near the centre of the room, Norris holding her husband by his wrists.   They were both in their night clothes.   Norris ran her husband back to the door and shoved him out on the steps, and turned back and said: "He has killed me for nothing; I came in and pulled off my clothes and laid down on the floor, to cool, or sat on the side of the bed (witness did not remember which), and Strickland, the first thing I knew, commenced cutting me with a knife; it is d—d hard to die for nothing."   Norris then got the pistol and fired, as stated by the witness Heard.   Witness says that after the difficulty her husband's pants were lying on the foot of his bed, and Norris's clothes were hanging on a chair at the head of his bed.   She states that, just before Norris died, in the evening of the same day, when she was alone with him, he asked her where Strickland was, and she told him he was in jail.   He then said he did not want him hurt for what he had done, that he was not to blame.   She stated that at the time of the difficulty her husband was sick, and that Norris was a much stouter man than her husband.

Anna Strickland, daughter of defendant, testified that she and her little sister were sleeping at the foot of their mother's bed on the floor, and in the scuffle between Norris and her father one of them stepped on her head, as she supposed, and awoke her, and that when her mother struck a light she saw Norris and her father standing about the middle of the room, Norris having her father by each arm; and her father had a large pocket knife in his hand, and Norris ran him back and pushed him out of the door.

There was evidence that there was blood on the floor, mostly about the centre of the room.

We have recited substantially all the evidence which relates to the homicide at the immediate time of its occurrence.   It is not disclosed by the evidence where the other boarder, Henry, was at the time of the killing.   He does not testify in the case, and no mention is made of him by witnesses who did testify.

We therefore conclude that he was absent from the house at the time, and had no knowledge of the transaction.

Other facts proved bearing indirectly upon the tragedy are about as follows: James Ferguson testified that a short time before Norris was killed—he does not state how long before—Strickland said to him, witness, that there was a man in town that he intended to cut as long as he could stay in reach of him, the first good chance he could get. Norris was living in town at that time.

G. S. Goodin testified that on the night of the killing he and Norris were in company together at the Casino saloon in Orange, and Norris tried to get witness to go with him and pull Strickland out of bed, saying he would, or wanted to, stamp his d—d life out of him.

Horace Glenn testified that on the night Norris was cut he came into the Casino saloon in company with another person, and called for a schooner of beer, remarking that when he done a thing he wanted to do it well. Witness asked him what he meant. He replied, "Never mind; don't you be surprised if you hear of somebody getting shot before day." He seemed to be drinking a good deal.

We have now stated substantially the material portions of the evidence as presented by the statement of facts.

When the case was called for trial, defendant presented an application for a continuance for the want of the testimony of one Joseph Rowe, alleged to be a resident of Orange county. This application stated substantially that said Rowe resided in one quarter of a mile of the court house; that as soon as defendant was served with a copy of the indictment he had caused a subpœna to be issued for Rowe and placed in the hands of the sheriff for service, who some days after reported said subpœna lost or mislaid; that he immediately caused another subpœna to be issued for said witness, and placed in the hands of the same officer, and that said officer had, on the morning of the day that the cause was called for trial, reported that said witness Rowe had not been found, and that said officer was then absent from the court house in search of said witness, and that said officer had stated in open court that he believed said witness was evading the service of said subpœna. That he expects to prove by said Rowe that James Norris, on his death bed and when he was conscious of approaching death, stated to said witness that defendant was not to blame for what he did; that he only did

what any other man would have done under the circumstances, and that he, Norris, did not wish defendant troubled therefor, etc. This application was properly overruled because it did not state, as required by the statute, that there was no reasonable expectation that the attendance of the witness could be secured during that term of the court by a postponement of the trial to some future day of the term. (Code Crim. Proc., Art. 559.)

But immediately upon the overruling of the application for a continuance, the defendant presented to the court an application for a postponement of the trial to some future day of the term, to enable him to obtain the testimony of said witness. This application contains substantially the matters embraced in the defendant's application for a continuance. It was overruled by the court, and the defendant was compelled to go to trial without the witness Rowe; to which ruling of the court the defendant has excepted, and presents this action of the court in a bill of exceptions. We will consider this question in connection with the action of the court in overruling the defendant's motion for a new trial.

Among other grounds embraced in defendant's motion for a new trial is the one of newly discovered evidence. In support of this ground of the motion the affidavits of T. G. S. Goodin and H. A. Glenn, both of whom had testified on the trial of the case, are produced. Goodin's affidavit is as follows: "States under oath that he was in company with James Norris on the night of August 12, 1882, being Saturday night. Norris was drinking a good deal. We parted at the Casino saloon and I went to Mrs. Bonvill's for a change of linen, when Norris came in. Seeing a pistol on the table, he asked me whose it was, and I told him it was mine. Norris then told me to load it; that he wanted me to go with him, and we might need it. I asked him why? Norris said that old man Strickland had found him, Norris, trying to go to bed to his, Strickland's, wife, and that Strickland had told him that if he ever caught him trying that again that he would kill him. Norris then said that he wanted me to go with him to Strickland's; that he, Norris, intended to pull Strickland out of the bed and stamp the d—n life out of him; and that Strickland had a pistol, and he, Norris, wanted mine; that he, Norris, might have to kill Strickland, and he wanted me to go along as a witness, so that if he, Norris, was accused of the killing that he could prove himself clear by me. I refused to go. He then said that he was going there anyhow,

x

and intended to snatch Strickland out of bed and stamp the d—d life out of him. This last conversation took place some twenty or thirty minutes before I heard the pistol fire in the direction of where Strickland lived. I then went up there, and on the way met Heard going after the doctor. I asked Heard what was the matter, and Heard said Strickland had cut Norris. I said, what! he turned the joke on him, did he? Heard remarked he guessed so. This was between twelve and one o'clock Saturday night, August 12, 1882. I further state that I never told defendant or his counsel all the facts as here stated. I only told counsel for defendant about the threat to pull Strickland out of the bed, and no more. Have had no conversation with Strickland since the killing. My reasons for not telling any more was that J. J. Norris, the father of James Norris, deceased, threatened that if I told what I knew that he, J. J. Norris, had papers against me from Sabine parish, Louisiana, and that he would have me arrested."

Glenn's affidavit is unimportant, and will not be recited or considered in this opinion.

It is stated by the defendant in his motion and under oath that up to the time of the trial he had had no opportunity to converse with the witness Goodin, and did not know until since the trial what facts could be proved by said witness, except the facts which the witness testified to on the trial

Defendant's motion for a new trial was overruled by the court, and the question for determination is, was this error for which the judgment of conviction should be reversed, taking into consideration, at the same time, the overruling of defendant's application to postpone the trial?

It is to be remarked in the outset that neither the facts stated in the application to postpone, affecting the diligence used to obtain the witness Rowe, nor the truth of the causes set forth in the motion for a new trial, were controverted by the State, which might have been done, if untrue. (Code of Crim. Proc., Arts. 564, 781.) We are therefore to accept as true the matters set forth in the application for postponement, and in the motion for a new trial, unless the probability of the truth of such matters were called in question by the evidence, which is not the case here.

In considering the application for postponement, two questions present themselves: Was the evidence of the witness Rowe material? If material, was it admissible? Both these questions,

we think, must be answered in the affirmative, when viewed with reference to the other evidence in the case. On the part of the State, the dying declarations of deceased were admitted, to the effect that he had been killed for nothing, and that the assault upon him was unprovoked and wholly unjustifiable. It was proposed to prove by the witness Rowe other dying declarations of deceased, made at a different time, in rebuttal and contradiction of those proved by the State. That this evidence was both admissible and material in this attitude of the case, we have not a doubt; and, while the overruling the application would not, in the first instance, be the subject of revision by this court, yet it should have been taken into consideration by the court below in passing upon the defendant's motion for a new trial, and will be considered by this court in revising the action of the court in refusing a new trial. We think the evidence, as developed on the trial, showed that the application for postponement should have been granted.

In regard to the newly discovered evidence, as set forth in the affidavit of the witness Goodin, it is certainly of most material character. It sheds a new light upon this otherwise strange homicide. It is to be noted that the evidence on the trial discloses no ill-feeling, or cause for ill-feeling, between the defendant and the deceased up to the time of the homicide. Deceased was boarding at defendant's house, and no previous difficulty had occurred between them. Apparently there was no cause or motive to produce this difficulty. The newly discovered evidence of this witness shows ample cause for trouble between the parties. It proves that deceased himself acknowledged that defendant had caught him in the act of attempting to violate his marital couch, and had warned him to do so no more, and that this had incensed and maddened the deceased to such an extent that he was threatening, not more than twenty or thirty minutes before the difficulty, to go to the house of defendant and pull him from his bed and stamp his life out of him, and left the witness expressing a determination to do so. These threats and this conduct on the part of the deceased immediately preceding the fatal rencounter, strongly corroborate the statement of defendant, made at the time of the killing, that deceased had pulled him from the bed by the hair of the head, and was stamping him when he did the cutting.

And we think that the defendant sufficiently shows why this newly discovered evidence was not produced on the trial. He

was not aware of its existence, and, for reasons personal to the witness, it was locked up in the breast of that witness. No diligence, therefore, that the defendant could have used would have obtained the testimony for the trial. If the statements made by this witness in his affidavit are untrue, they should have been controverted. No attempt was made to do this, and for the purposes of our determination of the matter we must take all the statements as true. We think the motion for new trial should have been granted, and that the court erred in overruling it, and for this error the judgment of conviction is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered January 27, 1883.